Jacqueline Ann McKaye
1784 De Mar Ave.
Laguna Beach, CA 92651
P: (949) 339-7824
Jackie.McKaye@bluestem.com

Debtor, In Pro Per

**FILED**

JAN 24 2023

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY:_____ Deputy Clerk

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA, SANTA ANA DIVISION

| | |
|---|---|
| In re JACQUELINE ANN MCKAYE.<br><br>**Debtor**<br>_____<br><br>JACQUELINE ANN MCKAYE, an individual,<br><br>**Plaintiff,**<br><br>v.<br><br>CARDENAS THREE, LLC, a California limited liability company; C&H TRUST DEED SERVICE, an unknown entity; SPENCER CURRIE, an individual; ALTA LOMA ENTERPRISES, LLC, a California limited liability company; JESUS CARDENAS, JR. an individual; JOSE CARDENAS, an individual; THANYA MERCADO, an individual; NEFERTITI U. LONG, an individual; and, GERARDO ROA MACIAS, JR., an individual.<br><br>**Defendants**<br>_____ | ADVERSARY CASE NO.<br><br>CHP. 7 CASE NO. 8:23-bk-10045 TA<br><br>8:23-ap-01005-TA<br><br>ADVERSARY COMPLAINT:<br><br>1. **TO SET ASIDE WRONGFUL NON-JUDICAL FORECLOSURE, CONDUCTED BASED ON EXTINGUISHED 2017 DEED OF TRUST**<br>2. **BREACH OF NOVATION AGREEMENT (THAT EXTINGUISHED 2017 DEED OF TRUST) PURSUANT TO CIV. CODE § 1531(1)**<br>3. **DECLARATORY RELIEF RE: VALIDITY OF NOVATION AGREEMENT, VOIDABLE FORECLOSURE SALE, AND PLAINTIFF'S RIGHT TO BID PURSUANT TO CIV. CODE § 2924m**<br>4. **WRONGFUL JUDICAL FORECLOSURE, BASED ON VIOLATION OF CIVIL CODE §§ 2924.19 AND 2924.17**<br>5. **MAKING AND ARRANGING REAL ESTATE LOANS WITHOUT REQUIRED STATE LICENSES**<br>6. **NEGLIGENT FAILURE TO RECORD 2020 CARDENAS DEED OF TRUST**<br>7. **FRAUDULENTLY NOTARIZED SIGNATURES**<br>8. **QUIET TITLE**<br>9. **ACCOUNTING** |

-1-

### SUMMARY OF CLAIMS AND REMEDIES

1.   Plaintiff JACQUELINE ANN MCKAYE ("Plaintiff" or Debtor") brings this action to set aside the wrongful December 28, 2022, non-judicial foreclosure sale conducted by Defendant C&H TRUST DEED SERVICE, Trustee ("C&H") on behalf of Defendant CARDENAS THREE, LLC ("Cardenas Three"), against the improved single family real property located at 1784 Del Mar Avenue, Laguna Beach, CA 92651 (the "Property"), valued at approximately $1,700,000, owned Plaintiff by since January 5, 2001.

2.   The foreclosure sale should be set aside because the February 24, 2020, refinance transaction (the "2020 Refinance Transaction") was intended to, and should have involved:

(a) the recording of a Deed of Trust securing a $608,465 loan to Plaintiff from Caliber Home Loans, Inc. ("Caliber"), insured by the Federal Housing Administration ("FHA"), in first position against the Property (the "2022 Caliber Deed of Trust"), and

(b) the recording of a Deed of Trust securing a $245,647 loan to Plaintiff from Cardenas Three, in second position against the Property. However, this "2022 Cardenas Deed of Trust", which expressly stated "is second and junior in lien to a deed of trust recording concurrently herewith," was never recorded.

3.   The two loans in the 2020 Refinance Transaction were arranged by Defendant ALTA LOMA ENTERPRISES, LLC ("Alta Loma"), owned by Defendants JESUS CARDENAS, JR. and JOSE CARDENAS, also the owners of Defendant Cardenas Three, and Defendants THANYA MERCADO and NEFERTITI U. LONG, were officers or employees of both Alta Loma Enterprises and Cardenas Three.  None of these Defendants were licensed as real estate brokers or agents by the California Department of Real Estate.

4.   When Plaintiff fell behind on payments to Cardenas Three, notwithstanding the

2022 Refinance Transaction and <u>contrary to the 2022 Cardenas Deed of Trust</u>, Trustee C&H recorded a Notice of Default on June 30, 2022, that <u>referenced a prior Deed of Trust</u> recorded January 20, 2017, securing a $608,465 loan to Plaintiff from Cardenas Three that <u>erroneously remained in first position</u> against the Property (the "2017 Cardenas Deed of Trust").

5.   Plaintiff contends the February 21, 2020, $245,647 Promissory Note from Plaintiff to Cardenas Three, expressly to be secured by the "2022 Cardenas Deed of Trust" in the 2020 Refinance Transaction, constitutes a **Novation Agreement** that extinguished the 2017 Cardenas Deed of Trust.

6.   In an apparent attempt to rectify the erroneous lien priorities, on September 28, 2022, Cardenas Three executed a **Subordination Agreement** by itself, not with Caliber nor with the Debtor, agreeing to subordinate the 2017 Cardenas Deed of Trust. No consideration is recited in the Subordination Agreement as having been paid by or between Caliber, Cardenas Three or Plaintiff.

7.   For all the above reasons, Plaintiff contends that the foreclosure sale conducted based on the extinguished 2017 Cardenas Deed of Trust was wrongful and should be set aside; that the Novation Agreement is valid and was breached by Cardenas Three and C&H; and, that the Notice of Default and Subordination Agreement are voidable by Plaintiff.

8.   Defendant SPENCER CURRIE ("Currie') was the putative third-party buyer at the foreclosure auction for $725,100, subject to the 2022 Caliber Deed of Trust.  However, once the foreclosure sale is properly set aside, and the Property established as property of the Debtor's bankruptcy estate, the Court should (a) issue a Temporary Restraining Order, preventing Trustee C&H from recording a Trustee's Deed Upon Sale in favor of Currie and, (b) order Trustee C&H to return to Currie the amount he paid at the wrongful foreclosure sale.

9.  In support of her claim for wrongful foreclosure, Plaintiff is ready, willing and able to tender the entire amount due under the February 20, 2020, Promissory Note to Cardenas Three in the original principal amount of $245,647.70, plus all interest and fees accrued thereon.

10. In the alternative, should the Court find that the foreclosure was proper, Plaintiff seeks declaratory relief from the Court clarifying that based on Plaintiff's January 10, 2023, Declaration, Plaintiff qualifies as an Eligible Bidder and Prospective Owner Occupant under Civ. Code, §2924m, therefore, Plaintiff may submit a Bid to C&H to purchase the Property within 45 days of the foreclosure sale.

11. In the alternative, in the event a Trustee's Deed Upon Sale is recorded and the Court finds that the foreclosure was wrongful, however, should not be rescinded, then, pursuant to Civil Code §§ 2924.19 and 2924.17, the Court should award Plaintiff the greater of treble actual damages or statutory damages of fifty thousand dollars ($50,000).

## JURISDICTION

12. This Court has jurisdiction of this adversary proceeding pursuant to 11 U.S.C. § 506.

13.  This is a core proceeding under 28 U.S.C. § 157(b)(2), and 1334.

## VENUE

14. Venue is proper under 28 U.S.C. § 1409.

## PARTIES

15.  JACQUELINE ANN MCKAYE ("Plaintiff" or Debtor") is an individual; a resident of the county of Orange, state of California; and, owner of the improved single family real property located at 1784 Del Mar Avenue, Laguna Beach, CA  92651 (the "Property"), where she lives as a single mother with her two sons, both attending Laguna Beach High School.

16. Plaintiff is informed and believes, and based thereon alleges, Defendant CARDENAS THREE, LLC ("Cardenas Three") was and is now, a limited liability company purportedly duly organized and in good standing in the state of California, however, not licensed in California as a Finance Lender, Real Estate Broker, or Mortgage Loan Originator.

17. Plaintiff is informed and believes, and based thereon alleges, that Defendant C&H TRUST DEED SERVICE ("C&H"), is an unknown entity, perhaps, an unregistered fictitious business of Coby Halavais, an individual and licensed attorney in California, with putative authority to act as an Agent or Trustee on behalf of Cardenas Three.

18. Plaintiff is informed and believes, and based thereon alleges, that Defendant SPENCER CURRIE ("Currie") is an individual, and resident of the county of Orange, state of California.

19. Plaintiff is informed and believes, and based thereon alleges, that Defendant ALTA LOMA ENTERPRISES, LLC ("Alta Loma"), was and is now, a limited liability company, purportedly duly organized and in good standing in the state of California, and an affiliate of Cardenas Three, however, not licensed in California as a Finance Lender, Real Estate Broker, or Mortgage Loan Originator.

20. Plaintiff is informed and believes, and based thereon alleges, that Defendant JESUS CARDENAS, JR. is an individual; a resident of the county of Orange, state of California; and, a principal owner of both Cardenas Three and Alta Loma.

21. Plaintiff is informed and believes, and based thereon alleges, that Defendant JOSE CARDENAS is an individual; a resident of the county of Orange, state of California; and, a principal owner of both Cardenas Three and Alta Loma.

22. Plaintiff is informed and believes, and based thereon alleges, that Defendant

THANYA MERCADO ("Mercado") is an individual; a resident of the county of Orange, state of California; and an officer and/or employee of both Cardenas Three and Alta Loma.

23. NEFERTITI U. LONG ("Long") is an individual; a resident of the county of Orange, state of California; and an officer and/or employee of both Cardenas Three and Alta Loma.

24. Plaintiff is informed and believes, and based thereon alleges, that Defendant GERARDO ROA MACIAS, JR. ("Macias") is an individual; resident of the county of Orange, state of California; and was a licensed Notary in connection with the 2020 Refinance Transaction.

25. Whenever reference is made in this Complaint to any act of any Defendant(s), that allegation shall mean that each Defendant acted individually and jointly with the other Defendants. Any allegation about acts of any entity or other business Defendant, means that the corporation or other business did the acts alleged through its officers, directors, employees, agents, brokers and/or representatives while they were acting within the actual or ostensible scope of their authority. The exact terms and conditions of the agency, representation, or employment relationships are presently unknown to Plaintiff but when the information is ascertained, leave of court will be sought to insert appropriate allegations.

26. Plaintiff is informed and believes, and based thereon, alleges that at all relevant times, each Defendant committed the acts, caused or directed others to commit the acts, or permitted others to commit the acts alleged in this Complaint. Additionally, some or all of the Defendants acted as the agent or the assignee or the substitute of other Defendants, and all Defendants acted within the scope of their agency if acting as an agent, the assignee or the substitute of another. Further, Plaintiff is informed and believes, and based thereon, alleges that at all relevant times, each Defendant knew or realized that the other Defendants were

engaging in or planned to engage in the violations of law alleged in this Complaint. Knowing or realizing that other Defendants were engaging in or planning to engage in unlawful conduct, each Defendant nevertheless facilitated the commission of those unlawful acts and, intended to and did facilitate or assist in the commission of the unlawful acts, and thereby aided and abetted the other Defendants in the unlawful conduct.

27. Plaintiff is further informed and believes, and based thereon, alleges that at all relevant times, Defendants have engaged in conspiracy, common enterprise, and common course of conduct, the purpose of which is and was to engage in the violations of law alleged in this Complaint. This conspiracy, common enterprise, and common course of conduct is continuing.  When additional facts are determined, Plaintiff will amend this Complaint to fully allege the scope and facts involving the conspiracy and common enterprise among the Defendants.

28.  Plaintiff is informed and believes, and based thereon, alleges that Jesus Cardenas, Jr. and Jose Cardenas own and control Cardenas Three, and that at all times herein mentioned there existed a unity of interest and ownership between Jesus Cardenas, Jr. and Jose Cardenas, on one hand, and Cardenas Three, on the other hand, such that any individuality and separateness between such individuals and entity ceased, and Jesus Cardenas, Jr. and Jose Cardenas are the alter ego of Cardenas Three, and Cardenas Three is the alter ego of Jesus Cardenas, Jr. and Jose Cardenas, based the following facts, including, but not limited to:

(a)   Cardenas Three is a mere entity shell or sham without adequate capital or assets and was conceived and used by Jesus Cardenas, Jr. and Jose Cardenas as a device to avoid individual liability and for the purpose of substituting a financially insolvent entity in their place.

(b) Jesus Cardenas, Jr. and Jose Cardenas personal finances and bank accounts were completely commingled with the entity finances and bank accounts of Cardenas Three, and personal funds were used to pay business expenses, and business funds were used to pay personal expenses;

(c) Cardenas Three was so inadequately capitalized that, compared with the business which Cardenas Three claimed it did and the risks of loss, any capitalization was illusory;

(d) The business of Cardenas Three was carried out without the observance of entity formalities, such as the holding of required entity or company meetings and/or the keeping of entity or company minutes of proceedings;

(e) The business of Cardenas Three was carried out without the observance of entity formalities, such as the holding of required entity or company meetings and/or the keeping of entity or company minutes of proceedings; and,

(f) Adherence to the fiction of the separate existence of Cardenas Three as an entity distinct from Jesus Cardenas, Jr. and Jose Cardenas would permit an abuse of the separate entity privileges, sanction a fraud, and promote injustice.

29. Plaintiff is informed and believes, and based thereon, alleges that Jesus Cardenas, Jr. and Jose Cardenas own and control Alta Loma, and that at all times herein mentioned there existed a unity of interest and ownership between Jesus Cardenas, Jr. and Jose Cardenas, on one hand, and Alta Loma, on the other hand, such that any individuality and separateness between such individuals and entity ceased, and Jesus Cardenas, Jr. and Jose Cardenas are the alter ego of Alta Loma, and Alta Loma is the alter ego of Jesus Cardenas, Jr. and Jose Cardenas, based the following facts, including, but not limited to:

(a)   Alta Loma is a mere entity shell or sham without adequate capital or assets and was conceived and used by Jesus Cardenas, Jr. and Jose Cardenas as a device to avoid individual liability and for the purpose of substituting a financially insolvent entity in their place.

(b) Jesus Cardenas, Jr. and Jose Cardenas personal finances and bank accounts were completely commingled with the entity finances and bank accounts of Alta Loma, and personal funds were used to pay business expenses, and business funds were used to pay personal expenses;

(c)   Alta Loma was so inadequately capitalized that, compared with the business which Alta Loma claimed it did and the risks of loss, any capitalization was illusory;

(d) The business of Alta Loma was carried out without the observance of entity formalities, such as the holding of required entity or company meetings and/or the keeping of entity or company minutes of proceedings;

(e)   The business of Alta Loma was carried out without the observance of entity formalities, such as the holding of required entity or company meetings and/or the keeping of entity or company minutes of proceedings; and,

(f)  Adherence to the fiction of the separate existence of Alta Loma as an entity distinct from Jesus Cardenas, Jr. and Jose Cardenas would permit an abuse of the separate entity privileges, sanction a fraud, and promote injustice.

### THE ORIGINAL $806,000 CARDENAS THREE LOAN

30.   In January 2001, Plaintiff acquired the Property, together with her former husband David M. Brown.

31.   On or about January 20, 2017, Plaintiff refinanced the Property by borrowing

$806,000 from Cardenas Three pursuant to a Promissory Note bearing interest at 9.2% (the "2017 Cardenas Promissory Note," which Plaintiff cannot currently locate), secured by a Deed of Trust recorded in first position against the Property (a copy of this "2017 Cardenas Deed of Trust" attached as **Exhibit "A"** hereto)(the "2017 Refinance Transaction").

## THE 2022 REFINANCE TRANSACTION

32.   On or about February 21, 2020, Plaintiff again refinanced the Property in a "2022 Refinance Transaction", by borrowing $608,465 from Caliber pursuant to a "2022 Caliber Promissory Note" (a copy of which is attached as **Exhibit "B"** hereto). Plaintiffs are informed and believe, and based thereon allege, that the $608,465 loan amount was determined by Defendants Alta Loma, Jesus Cardenas, Jr., Jose Cardenas, and Long, who arranged this loan for purposes of complying with FHA loan limits, although none of them were then, or are now, licensed in California as a Finance Lender, Real Estate Broker or Mortgage Loan Originator.

33.   This $608,465 loan was insured by the Federal Housing Administration ("FHA"). Therefore, as required by FHA rules and regulations, Plaintiff and Caliber intended, that the 2022 Cardenas Promissory Note *would be* secured by a Deed of Trust recorded in first position against the Property.  However, as explained as follows, the "2022 Caliber Deed of Trust" (a copy of which is attached as **Exhibit "C"** hereto) was erroneously recorded in second position against the Property.

34.   The proceeds from the $608,465 loan were applied to partial pay off the 2017 Cardenas Promissory Note, with the remaining principal and interest owed on the 2017 Cardenas Promissory Note reflected in:

(a)   a new $245,647 Promissory Note from Plaintiff to Cardenas Three, bearing interest

-10-

at 7.99% per annum, not requiring any monthly payments, due in two years and expressly

stating that "[t]his note is secured by a Deed of Trust to First American Title, a California

corporation, as TRUSTEE," (a copy of this "2022 Cardenas Note" is attached as **Exhibit "D"**

hereto) and

(b) a new Deed of Trust stating that it secures "<u>one promissory note of even date</u>

<u>herewith … in the principal sum of $245,647</u> executed by Trustor in favor of Beneficiary…

<u>This deed of trust is second and junior in lien to a deed of trust recording concurrently</u>

<u>herewith</u>." (a copy of this "2022 Cardenas Deed of Trust" is attached as **Exhibit "E"** hereto).

35. However, again the 2022 Cardenas Deed of Trust was <u>not</u> properly recorded, <u>nor</u>

was any Reconveyance of the 2017 Cardenas Deed of Trust properly recorded.  Nevertheless,

Plaintiff contends that the 2022 Cardenas Promissory Note and 2022 Cardenas Deed of Trust

constitute a **Novation Agreement**, extinguishing the 2017 Cardenas Deed of Trust.

## THE IMPROPER FORECLOSURE PROCESS

36.    On February 24, 2022, the two year 2022 Cardenas Note became fully due and

payable.

37.    On June 30, 2022, Cardenas caused, through C&H, its purported agent, a **Notice of**

**Default** to be recorded against the Property with the Orange County Recorder's Office (a copy

of which is attached as **Exhibit "F"** hereto).   However, rather than referencing the 2022

Cardenas Deed of Trust, this Notice of Default referenced the 2017 Cardenas Deed of Trust as

giving C&H the power of sale.

38.    On July 29, 2022, a Substitution of Trustee was recorded with the Orange County

Recorder's Office, substituting C&H as Trustee in place of Title 365 the original Trustee under

the 2017 Cardenas Deed of Trust.

39. September 22, 2022, Cardenas *unilaterally* executed a **Subordination Agreement** (a copy of which is attached as **Exhibit "G"** hereto), *that was not counter-signed by Caliber or Plaintiff, nor does it recite any consideration therefor*, asserting that:

> "(1) That the Cardenas Three lien [the 2017 Cardenas Deed of Trust] shall be and hereby is subordinated to be junior and inferior to the Caliber lien [the 2022 Caliber Deed of Trust], and any renewals or extensions thereof, and the Caliber lien shall unconditionally be and remain at all times a lien or charge on the Property senior, prior and superior to the Cardenas Three Deed of Trust. Additionally, the Notice of Default issued and recorded by Cardenas three, LLC, on June 30, 20022, as Instrument number 2022-00233302, as well as ay and all activities related in any way to foreclosure of the Cardenas Three Deed of Trust, shall not and does not impair, affect or challenge the priority, seniority and/or enforceability of the Caliber Deed of Trust."

No mention is made of the 2022 Cardenas Deed of Trust in this Subordination Agreement. A copy of this Subordination Agreement, recorded on September 28, 2022, with the Orange County Recorder's Office as Instrument No. 2022000319053, a copy of which is attached as **Exhibit "H"** hereto.

40. On September 30, 2022, Cardenas caused, through C&H, its Trustee, a **Notice of Trustee's Sale** to be recorded against the Property with the Orange County Recorder's Office (a copy of which is attached as **Exhibit "I"** hereto), scheduling a foreclosure sale on October 28, 2022.

41. On October 19, 2022, Caliber caused, through Quality Loan Service Corporation, its Truste, a **Notice of Default** to be recorded against the Property with the Orange County Recorder's Office as Instrument No. 2022000338276, a copy of which is attached as **Exhibit "J"** hereto.

42. On October 28, 2022, Debtor filed a Chp. 13 voluntary Bankruptcy Petition, Case No. 2:22-bk-15894-WB, in the Central District of California, Los Angeles Division (the "Prior Bankruptcy Case"). On November 14, 2022, the Debtor file a Chapter 13 Plan. On November

-12-

18, 2022, Cardenas filed a Motion for Relief from the Automatic Stay. On December 14, 2022,

Cardenas filed an Objection to Confirmation of Plan.  On December 15, 2022, the Debtor failed

to appear for the Sec. 341(a) First Meeting of Creditors.  On December 27, 2022, the

Bankruptcy Court dismissed the Debtor's Prior Bankruptcy Case, based on her failure to

attend the Sec. 341(a) hearing.

43.    The next day, on December 28, 2022, C&H conducted a foreclosure sale and the

Property was sold to third-party buyer Spencer Currie ("Currie") for $725,100, who, that day,

purported provided C&H with a Declaration pursuant to Civ. Code §2924m asserting that he

is an eligible bidder based on being a prospective owner occupant of the Property.  A copy of

Currie's Declaration is attached as **Exhibit "K"** hereto. However, C&H has contended that the

foreclosure sale is final and there are no legitimate grounds for rescinding such sale.

44.    On January 11, 2022, Debtor filed the instant Chp. 7 Bankruptcy Case.  The Sec.

341(a) First Meeting of Creditors is scheduled for February 23, 2023, at 8:00 a.m. at TR 7

45.    Also, on January 11, 2023, Plaintiff's counsel by letter to Coby Halavais, Esq.: (a)

made Demand on C&H to respect the Automatic Stay pursuant to Bankruptcy Code §362(a)

that C&H not record a Trustee's Deed Upon Sale with respect to the Property in favor of Currie

and (b) delivered Plaintiff's Declaration pursuant to Civ. Code §2924m asserting that she is an

eligible bidder based on being a prospective owner occupant of the Property.  A copy of

Plaintiff's Declaration is attached as **Exhibit "L"** hereto.

## FIRST CAUSE OF ACTION
### TO SET ASIDE WRONGFUL NON-JUDICAL FORECLOSURE, CONDUCTED BASED ON EXTINGUISHED 2017 DEED OF TRUST
#### (Against Cardenas and C&H)

46.    Plaintiff realleges and incorporates by reference each and every allegation above, as

though set forth fully herein.

47.   On December 28, 2022, Cardenas and C&H caused a foreclosure sale of Plaintiff's Property purportedly pursuant to the power of sale in the 2017 Cardenas Deed of Trust, exercised in (a) the June 30, 2022, Cardenas Notice of Default attached as Exhibit "F" hereto, and (b) the September 30, 2022, Cardenas Notice of Trustee's Sale attached as Exhibit "I" hereto.

48.   The foreclosure sale was wrongful because in the 2022 Refinance Transaction, the 2020 Cardenas Note and 2022 Cardenas Deed of Trust as intended by Plaintiff, Cardenas, Caliber and FHA, constituted a Novation Agreement as a matter of law pursuant to Civ. Code §1531(1), such that: (a) Plaintiff's obligation under the 2017 Cardenas Note was extinguished and the 2022 Cardenas Note was substituted therefor, and (b) the 2017 Cardenas Deed of Trust was also extinguished, such that no power of sale continued to exist under the 2017 Cardenas Deed of Trust, notwithstanding that there was no Reconveyance of the 2017 Cardenas Deed of Trust.

49.   Plaintiff is ready, willing and able to tender all amounts that are due to Cardenas under the 2020 Note, however, Cardenas and C&H have not provided an itemization of such amounts.   Except for late payment on the 2022 Cardenas Note, Plaintiff was not in material default of any other terms of the 2022 Cardenas Note.

50.   As a direct and proximate result of Defendants Cardenas' and C&H's wrongful foreclosure, Plaintiff has suffered irreparable harm by the loss of her Property, which can only be remedied by a rescission of the foreclosure sale.   In the alternative, Plaintiff prays for money damages measure by the value of her total equity in the Property, plus consequential damages caused by Defendants tortious conduct.

## SECOND CAUSE OF ACTION
### BREACH OF NOVATION AGREEMENT (THAT EXTINGUISHED 2017 DEED OF TRUST) PURSUANT TO CIV. CODE, SEC. 1531(1)
### (Against Cardenas and C&H)

51.   Plaintiff realleges and incorporates by reference each and every allegation above, as though set forth fully herein.

52.   Plaintiffs allege that in the 2022 Refinance Transaction, the 2020 Cardenas Note and 2022 Cardenas Deed of Trust as intended by Plaintiff, Cardenas, Caliber and FHA, constituted a Novation Agreement as a matter of law pursuant to Civ. Code §1531(1), such that: (a) Plaintiff's obligation under the 2017 Cardenas Note was extinguished and the 2022 Cardenas Note was substituted therefor, and (b) the 2017 Cardenas Deed of Trust was also extinguished, such that no power of sale continued to exist under the 2017 Cardenas Deed of Trust, notwithstanding that there was no Reconveyance of the 2017 Cardenas Deed of Trust.

53.   By recording the June 30, 2022, Cardenas Notice of Default and the September 30, 2022, Cardenas Notice of Trustee's Sale, and by conducting the December 28, 2022, foreclosure purportedly based on the continuing power of sale in the 2017 Cardenas Deed of Trust, Defendants Cardenas and C&H breached the Novation Agreement.

54.   As a direct and proximate result of Defendants Cardenas' and C&H's wrongful foreclosure, Plaintiff has suffered irreparable harm by the loss of her Property, which can only be remedied by a rescission of the foreclosure sale.   In the alternative, Plaintiff prays for money damages measure by the value of her total equity in the Property, plus consequential damages caused by Defendants' breach.

## THIRD CAUSE OF ACTION
### DECLARATORY RELIEF RE: VALIDITY OF NOVATION AGREEMENT, VOIDABLE FORECLOSURE SALE, AND PLAINTIFF'S RIGHT TO BID PURSUANT TO CIV. CODE, SEC. 2924m
### (Against Cardenas, C&H and Currie)

55.  Plaintiff realleges and incorporates by reference each and every allegation above, as though set forth fully herein.

56.  Plaintiffs are informed and believe and, based thereon allege, that actual and present controversies exist between Plaintiff, on one hand, and Defendants Cardenas, C&H and Currie, on the other hand, in that Plaintiff contends, and such Defendants deny, that:

(a)  in the 2022 Refinance Transaction, the 2020 Cardenas Note and 2022 Cardenas Deed of Trust as intended by Plaintiff, Cardenas, Caliber and FHA, constituted a Novation Agreement as a matter of law pursuant to Civ. Code §1531(1), such that: (a) Plaintiff's obligation under the 2017 Cardenas Note was extinguished and the 2022 Cardenas Note was substituted therefor, and (b) the 2017 Cardenas Deed of Trust was also extinguished, such that no power of sale continued to exist under the 2017 Cardenas Deed of Trust, notwithstanding that there was no Reconveyance of the 2017 Cardenas Deed of Trust;

(b)  by reason of the Novation Agreement, the June 30, 2022, Cardenas Notice of Default, the September 30, 2022, Cardenas Notice of Trustee's Sale, and the December 28, 2022, foreclosure sale are voidable by Plaintiff, or otherwise constitute breaches of the Novation Agreement, notwithstanding the Subordination Agreement which fails to constitute a valid agreement due to lack of mutual consent and lack of consideration; and,

(c)  pursuant to Civ. Code §2924m, Plaintiff qualifies as an eligible bidder and prospective owner occupant, such that Plaintiff made make a Bid with respect to the Property within provisions of this section.

57.  Therefore, Plaintiff request that the Court review all the documents attached to or referred to in this Adversary Complaint and make interpretative declarations as a matter of law in Plaintiff's favor as Plaintiff contends in ¶56, above.

-16-

**FOURTH CAUSE OF ACTION**
**WRONGFUL JUDICAL FORECLOSURE, BASED ON**
**VIOLATION OF CIVIL CODE §§ 2924.19 AND 2924.17**
**(Against Cardenas, Mercado Long and C&H)**

58. Plaintiff realleges and incorporates by reference each and every allegation above, as though set forth fully herein.

59.    Plaintiff is informed and believes and, based thereon alleges, that notwithstanding (a) Plaintiff's counsel's Demand on C&H to not record a Trustee's Deed Upon Sale in favor of Currie, and (b) the Automatic Stay, that C&H has nevertheless recorded such a Trustee's Deed Upon Sale.

60.    California Civil Code, Sec. 2924.19(b), provides that:

"After a trustee's deed upon sale has been recorded, a mortgage servicer, mortgagee, beneficiary, or authorized agent shall be liable to a borrower for actual economic damages pursuant to Section 3281, resulting from a material violation of Section 2923.5, 2924.17, or 2924.18 by that mortgage servicer, mortgagee, beneficiary, or authorized agent where the violation was not corrected and remedied prior to the recordation of the trustee's deed upon sale. If the court finds that the material violation was intentional or reckless, or resulted from willful misconduct by a mortgage servicer, mortgagee, beneficiary, or authorized agent, the court may award the borrower the greater of treble actual damages or statutory damages of fifty thousand dollars ($50,000)."

61.    California Civil Code, Sec. 2924.17, provides that:

"(a) A declaration recorded pursuant to Section 2923.5 or pursuant to Section 2923.55, a notice of default, notice of sale, assignment of a deed of trust, or substitution of trustee recorded by or on behalf of a mortgage servicer in connection with a foreclosure subject to the requirements of Section 2924, or a declaration or affidavit filed in any court relative to a foreclosure proceeding shall be accurate and complete and supported by competent and reliable evidence.

62. Plaintiff is informed and believes and, based thereon alleges, that Cardenas, as lender and beneficiary; Mercado and Long, as Senior Loan Officers with Cardenas; and C&H, as Trustee agent, had numerous opportunities to verify, correct and remedy faulty documents,

and the improper priority of deeds of trust so as to be properly consistent with the intentions of Plaintiff, Cardenas Caliber and FHA following the 2022 Refinance Transaction, both before and after the Cardenas Notice of Default was recorded, the Substitution of Trustee was recorded substituting C&H as Trustee, the Subordination Agreement was executed and recorded and, the Cardenas Notice of Trustee's Sale was recorded, however, Defendants Cardenas, Mercado, Long and C&H intentionally or recklessly failed to verify, correct and remedy faulty documents, or engaged in willful misconduct in authorizing and recording a Trustee's Deed Upon Sale.

63.    In particular, on November 18, 2022, Cardenas filed a Motion for Relief from Stay in Debtor's Prior Bankruptcy Case, supported by a Declaration from Long, describing a default on the 2022 Cardenas Note, however, inconsistently referring to the 2017 Cardenas Deed of Trust.  This Court is requested to take Judicial Notice of ROA #19 in Debtor's Prior Bankruptcy Case.

64.    Defendants' actions and failure to act constitute violations of Civ. Code, Sec. 2924.19(b).

65.    As a direct and proximate result of Defendants Cardenas', Mercado's, Long's and C&H's violations of Civ. Code, Sec. 2924.19(b), Plaintiff has suffered irreparable harm by the loss of her Property.  In the alternative, if the Court does not set aside and rescind the foreclosure sale as requested in Plaintiff's other causes of action herein, then, in the alternative, Plaintiff prays for money damages as authorized by Civil Code, Sec. 2924.19(b), of the greater of treble actual damages or statutory damages of fifty thousand dollars ($50,000).

## FIFTH CAUSE OF ACTION
### MAKING AND ARRANGING REAL ESTATE LOANS
### WITHOUT THE REQUIRED STATE LICENSES
**(Against Cardenas, Alta Loma, Jesus Cardenas, Jr., Jose Cardenas, Mercado and Long)**

-18-

66. Plaintiff realleges and incorporates by reference each and every allegation above, as though set forth fully herein.

67. Plaintiff is informed and believes and, based thereon alleges, that Cardenas (a) has never held any type of license from any state of California regulatory agency, issued pursuant to Finance Lender Laws or Real Estate Broker Laws, authorizing Cardenas to make a loan secured by real property, particularly, not a high interest, hard money loan, based on the equity in a property, not based on the borrower's ability to repay such loan and (b) is not exempt from all such licensing statutes and regulations.

68. Plaintiff is informed and believes and, based thereon alleges, that (a) neither Alta Loma, Jesus Cardenas, Jr., Jose Cardenas, Mercado, nor Long have ever held any type of license from any state of California regulatory agency, issued pursuant Real Estate Broker Laws or Mortgage Loan Originator Laws, authorizing such entity and persons to arrange or broker any loans on behalf of any lender, including, on behalf of Cardenas, and (b) such entity and persons are not exempt from all such licensing statutes and regulations.

69. Plaintiff would not have entered into the 2017 Refinance Transaction and the 2022 Refinance Transaction, is such Defendants had disclosed, so that she would have known, that such Defendants were not properly licensed to be involved in such transactions by the appropriate state of California regulatory agencies.

70. As a direct and proximate result of Defendants Cardenas', Alta Loma's, Jesus Cardenas, Jr.'s, Jose Cardenas', Mercado's and Long's failure to obtain and hold the requisite licenses from the pertinent state of California regulatory agencies, Plaintiff (a) entered into the 2017 Refinance Transaction and the 2022 Refinance Transaction and (b) subsequently, Cardenas wrongful foreclosed on her Property. As a result, Plaintiff has suffered irreparable

-19-

harm by the loss of her Property.

71.  By reason of Defendants failure to obtain and hold the requisite licenses from the pertinent state of California regulatory agencies, Plaintiff is entitled to declare and, hereby declares, that the 2017 Refinance Transaction and the 2022 Refinance Transaction are voidable. Plaintiff also prays for rescission of the foreclosure sale.  In the alternative, Plaintiff prays for money damages measure by the value of her total equity in the Property, plus consequential damages caused by Defendants' statutory violations.

**SIXTH CAUSE OF ACTION**
**NEGLIGENT FAILURE TO RECORD 2020 CARDENAS DEED OF TRUST**
**(Against Cardenas)**

72.  Plaintiff realleges and incorporates by reference each and every allegation above, as though set forth fully herein.

73.   Both the 2022 Cardenas Note and 2022 Cardenas Deed of Trust expressly state that such loan and deed and trust were to be junior and recorded in a second position against Plaintiff's Property.  Accordingly, Cardenas owed a duty of care to Plaintiff (a) as payor under 2022 Cardenas Note and as trustor under the 2022 Cardenas Deed of Trust, and (b) in Cardenas' capacity as payee under 2022 Cardenas Note and the beneficiary under the 2022 Cardenas Deed of Trust, to ensure that the 2022 Cardenas Deed of Trust was, in fact, recorded in a second position against Plaintiff's Property.

74.  In the 2022 Refinance Transaction, Cardenas breached its duty of care to Plaintiff by failing to ensure that the 2022 Cardenas Deed of Trust was, in fact, recorded in a second position against Plaintiff's Property.  Instead, Cardenas (a) failed to record the 2022 Cardenas Deed of Trust, (b) allowed the 2017 Cardenas Deed of Trust to remain in senior, first priority position against the Property via-a-vis the Caliber Deed of Trust, and, (c) Cardenas failed to

ensure that the 2017 Cardenas Deed of Trust was reconveyed.

75.  As a direct and proximate result of Defendant Cardenas' negligence, Plaintiff has suffered irreparable harm by the loss of her Property, which can only be remedied by a rescission of the foreclosure sale.  In the event that the Court does declare not set aside and rescind the foreclosure sale then, in the alternative, Plaintiff prays for money damages measure by the value of her total equity in the Property, plus consequential damages caused by Defendant's negligence.

**SEVENTH CAUSE OF ACTION**
**FRAUDULENTLY NOTARIZED SIGNATURES**
**(Against Macias)**

76.  Plaintiff realleges and incorporates by reference each and every allegation above, as though set forth fully herein.

77.  Plaintiff is informed and believes and, based thereon alleges, that in connection with the 2022 Refinance Transaction, Defendant Macias was the licensed Notary, whose purported signature is on the 2020 Cardenas Note and 2020 Cardenas Deed of Trust.

78.  Plaintiff alleges that her apparent signatures on the 2020 Cardenas Note and 2020 Cardenas Deed of Trust are not her genuine signatures and, instead, are false and forged.

79.  Plaintiff is informed and believes and, based thereon alleges, that in connection with the 2022 Refinance Transaction, Defendant Macias or other Defendants acting in concert with him and pursuant to a conspiracy with him, falsified and forged Plaintiff's signatures on the 2020 Cardenas Note and 2020 Cardenas Deed of Trust.

80.  As a direct and proximate result of Defendant Macias' fraud, Plaintiff has suffered irreparable harm by the loss of her Property, which can only be remedied by a rescission of the foreclosure sale.  In the alternative, if the Court does declare not set aside and rescind the

foreclosure sale, then, Plaintiff prays for money damages measure by the value of her total equity in the Property, plus consequential damages caused by Defendant's fraud.

### EIGHTH CAUSE OF ACTION
### QUIET TITLE
### (Against Currie)

81.  Plaintiff realleges and incorporates by reference each and every allegation above, as though set forth fully herein.

82.  By reason of (a) the December 28, 2022, foreclosure sale to Currie, and, perhaps, due to a Trustee's Deed Upon Sale being recorded in Currie's favor, and (b) both Currie and Plaintiff providing C&H with Declarations pursuant to Civ. Code §2924m, confusion currently exists as to whether Plaintiff or Currie owns the Property and, whether Plaintiff and Currie are entitled to submit a Bid pursuant to Civ. Code §2924m.

83.  As such, clouds exist on Plaintiff's interests in her Property.

84.  Accordingly, Plaintiff requests that the Court issue an Order declaring that the foreclosure sale is void or voidable, and Quieting Title to the Property in favor of Plaintiff and against Currie.

### EIGHTH CAUSE OF ACTION
### ACCOUNTING
### (Against Cardenas and C&H)

85.  Plaintiff realleges and incorporates by reference each and every allegation above, as though set forth fully herein.

86.  Notwithstanding the foreclosure sale, Plaintiff has made Demand upon Cardenas and C&H for an itemization of all amounts due on the 2022 Cardenas Note as of the foreclosure sale, however, Cardenas and C&H have failed and refused to provide such itemization and accounting.

-22-

87. In addition, assuming the foreclosure sale is respected, Plaintiff has made Demand upon C&H for an itemization of any Surplus Funds, measured by the difference between the $725,100 paid by Currie at the foreclosure sale and the total amount due to Cardenas on the 2022 Cardenas Note, plus all related C&H foreclosure costs, however, C&H has failed and refused to provide such itemization and accounting.

89. Accordingly, Plaintiff requests that the Court issue an Order (a) requiring Cardenas and C&H to itemize and account for all amounts due on the 2022 Cardenas Note, and (b) requiring C&H to itemize and account for the amount of any Surplus Funds.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff seeks a Judgment against Defendants, as set forth at the end of each Cause of Action above and, in addition, as follows:

## AND ON ALL CAUSES OF ACTION

1. For recovery of attorneys' fees incurred;

2. For recovery of the costs of suit;

3. For interest on all damages at the maximum legal rate; and,

4. For such other and further relief as the Court may deem just and proper.

Dated: January 24, 2022

Jacqueline Ann McKaye, Plaintiff
and Debtor, In Pro Per

Adversary Complaint: Jacqueline Ann McKaye v. Cardenas Three, LLC, et. al.

**EXHIBIT "A"**

Recorded in Official Records, Orange County
Hugh Nguyen, Clerk-Recorder

**Title365**

```
*$R00090111169$*
```
63.00

2017000028437  3:42 pm 01/20/17
227 NC-5 D11 F13   19
0.00 0.00 0.00 0.00 54.00 0.00 0.00 0.00

After Recording Return To:

Cardenas Three LLC
Attn: Roxanne Kwan
12223 Highland Ave., Suite 106-553
Rancho Cucamonga, CA 91739

QA0210-1008880-20 [Space Above This Line For Recording Data] _____

## DEED OF TRUST

### DEFINITIONS

Words used in multiple sections of this Security Instrument are defined below, in the "Definitions" Section of the Deed of Trust, and in Sections 3, 11, 13, 18, 20 and 21 of the Deed of Trust. Certain rules regarding the usage of words used in this Security Instrument are also provided in Section 16 of the Deed of Trust.

**(A)** **"Security Instrument"** means this document, which is dated January 19th, 2017 together with all Riders to this document.

**(B)** **"Borrower"** is Jacqueline McKaye. Borrower is the trustor under this Security Instrument.

**(C)** **"Lender"** is Cardenas Three LLC. Lender's address is Cardenas Three LLC 12223 Highland Ave., Suite 106-553 Rancho Cucamonga, CA 91739. . Lender is the beneficiary under this Security Instrument.

**(D)** **"Trustee"** is Title 365.

**(E)** **"Note"** means the promissory note signed by Borrower and dated January 19th, 2017. The Note states that Borrower owes Eight Hundred Six Thousand Dollars (U.S. $806,000.00) plus interest. Borrower has promised to pay this debt in regular Periodic Payments (as defined in the Deed of Trust) and to pay the debt in full not later than February 01, 2019

**(F)** **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
**(G)** **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
**(H)** **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider     ☐ Condominium Rider     ☐ Second Home Rider
☐ Planned Unit Development Rider   ☐ 1-4 Family Rider

Page | 1

All references to section numbers in the Security Instrument that are contained in the Riders refer to those sections of the same number incorporated from the Deed of Trust.

(I)  **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J)  **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K)  **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L)  **"Escrow Items"** means those items that are described in Section 3.

(M)  **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N)  **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O)  **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P)  **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender:  (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County of Los Angeles:

[SEE EXHIBIT A]

which currently has the address of 1784 Del Mar Ave Laguna Beach, CA 92651

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property.  All replacements and additions shall also be covered by this Security Instrument.  All of the foregoing is referred to in this Security Instrument as the "Property."

Page | 2

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the

delinquent payment and the late charge.  If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full.  To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.  Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3.  Funds for Escrow Items.**  Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items."  At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any,

be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items.  Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time.  Any such waiver may only be in writing.  In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9.  If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount.  Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA.  Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4.  Charges; Liens.**  Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5.  Property Insurance.**  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term

"extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may

disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower does intend to occupy, establish, or use the Property as Borrower's principal residence as of the execution of this Security Instrument.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.**    Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan.    Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.**  If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding.  Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off.  Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so.  It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease.  If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.**  If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender.  If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that

Page | 8

were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be

applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason
of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees,

property inspection and valuation fees.  In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee.  Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower.  Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower.  If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note).  Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15.  Notices.**  All notices given by Borrower or Lender in connection with this Security Instrument must be in writing.  Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means.  Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise.  The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender.   Borrower shall promptly notify Lender of Borrower's change of address.  If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower.  Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender.  If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16.  Governing Law; Severability; Rules of Construction.**  This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law.  Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract.  In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b ) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times

without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Page | 14

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge,  (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS.  Borrower and Lender further covenant and agree as follows:

**22.    Acceleration; Remedies.    Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise).  The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale.  If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law.  Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located.  Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law.  After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines.  Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale.  Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied.  The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein.  Trustee shall**

apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

    **23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

    **24. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

    **25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

    BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument (including those provisions of the Deed of Trust that are incorporated by reference) and in any Rider executed by Borrower and recorded with it.

[SIGNATURES ON NEXT PAGE]

The undersigned Borrower requests that a copy of any Notice of Default and any Notice of Sale under this Security Instrument be mailed to the Borrower at the address set forth above.

Date: 1 / 20 / 1 7

_____          _____
Jacqueline McKaye

_____          [Space Below This Line For Acknowledgment]          _____

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of Orange                    )

On January 20, 2017     before me, Katrina M. Belmonte, Notary Public

personally appeared   Jacqueline McKaye                    ,

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

KATRINA M. BELMONTE
COMM. # 2090757
NOTARY PUBLIC · CALIFORNIA
ORANGE COUNTY
COMM. EXPIRES DEC. 9, 2018

Signature _____          (Seal)

Page | 17

**EXHIBIT A**
Legal Description

The land hereinafter referred to is situated in the City of Laguna Beach, County of Orange, State of CA, and is described as follows:

Lot 8, Block in Block 64, of Arch Beach Heights, in the City of Laguna Beach, County of Orange, State of California, as per map recorded in Book 7, Page 9 and 10 of Miscellaneous Maps, in the Office of the County Recorder of said County.

APN: 644-461-10

**EXHIBIT "B"**

Generated by PDFKit.NET Evaluation



Loan Numb█
MIN █
FHA Case No.
███████

# NOTE

____FEBRUARY 24, 2020____        ____TORRANCE____        , ____CALIFORNIA____
[Date]        [City]        [State]

__1784 DEL MAR AVE, LAGUNA BEACH, CALIFORNIA 92651-3812__
[Property Address]

**1.  BORROWER'S PROMISE TO PAY**
In return for a loan that I have received, I promise to pay U.S. **$608,465.00** (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **CALIBER HOME LOANS, INC.** I will make all payments under this Note in the form of cash, check or money order.
I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.  INTEREST**
Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of **3.500%**.
The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

**3.  PAYMENTS**
**(A) Time and Place of Payments**
I will pay principal and interest by making a payment every month.
I will make my monthly payment on the 1ST day of each month beginning on **APRIL 1, 2020**. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **MARCH 1, 2050**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
I will make my monthly payments at **P.O. BOX 650856, DALLAS, TX 75265-0856** or at a different place if required by the Note Holder.
**(B) Amount of Monthly Payments**
My monthly payment will be in the amount of U.S. **$2,732.28**.

**4.  BORROWER'S RIGHT TO PREPAY**
I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.
I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

**5.  LOAN CHARGES**
If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**6.  BORROWER'S FAILURE TO PAY AS REQUIRED**
**(A) Late Charge for Overdue Payments**
If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **4.000%** of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.
**(B) Default**
If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.
**(C) Notice of Default**
If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.
**(D) No Waiver By Note Holder**
Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.
**(E) Payment of Note Holder's Costs and Expenses**
If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

© 2020 Covius Services, LLC
FHA MULTISTATE FIXED RATE NOTE (1/21/15)
HC# 4837-1414-4806v3                                                                        *Page 1 of 2*

Click here to unlock PDFK

7.  **GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail, to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

8.  **OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

9.  **WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

10.  **UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 14 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ _____ (Seal)
Borrower -  JACQUELINE LYNN MCKAYE BROWN

*[Sign Original Only]*

Loan Originator Organization: **CALIBER HOME LOANS, INC.**
NMLS ID ▮
Loan Originator: N/A
NMLS ID: N/A

Loan Originator Organization: **EQUINOX HOME FINANCING, INC.**
NMLS ID ▮
Loan Originator: **JOHN DOAN**
NMLS ID ▮

Pay to the order of

Without Recourse
Caliber Home Loans, Inc.

Jason Spencer
Operations Support Manager

© 2020 Covius Services, LLC
FHA MULTISTATE FIXED RATE NOTE (1/21/15)
HC# 4837-1114-4806v3

*Page 2 of 2*